Katharine S. Glover (Alaska Bar No. 0606033)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
907.586.2751; kglover@earthjustice.org; ejorgensen@earthjustice.org

Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (*pro hac vice pending*)
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
360.534.9900; nlawrence@nrdc.org

Garett R. Rose (D.C. Bar No. 1023909) (*pro hac vice pending*)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th St. NW
Washington DC 20005
202.289.6868; grose@nrdc.org

*Attorneys for Plaintiffs Organized Village of Kake, et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ORGANIZED VILLAGE OF KAKE; ORGANIZED VILLAGE OF SAXMAN; HOONAH INDIAN ASSOCIATION; KETCHIKAN INDIAN COMMUNITY; KLAWOCK COOPERATIVE ASSOCIATION; WOMEN'S EARTH AND CLIMATE ACTION NETWORK; THE BOAT COMPANY; UNCRUISE; ALASKA LONGLINE FISHERMEN'S ASSOCIATION; SOUTHEAST ALASKA CONSERVATION COUNCIL; NATURAL RESOURCES DEFENSE COUNCIL; ALASKA RAINFOREST DEFENDERS; ALASKA WILDERNESS LEAGUE; SIERRA CLUB; DEFENDERS OF WILDLIFE; NATIONAL AUDUBON SOCIETY; CENTER FOR BIOLOGICAL DIVERSITY; FRIENDS OF THE EARTH; THE WILDERNESS SOCIETY; GREENPEACE, INC.; NATIONAL WILDLIFE FEDERATION; and ENVIRONMENT AMERICA, | Case No. 1:20-cv-00011-HRH |
| Plaintiffs, | |
| v. | |
| SONNY PERDUE, in his official capacity as Secretary of Agriculture, UNITED STATES DEPARTMENT OF AGRICULTURE, STEPHEN CENSKY, or his successor, in his official capacity as Deputy Secretary of Agriculture; and UNITED STATES FOREST SERVICE, | |
| Defendants. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(5 U.S.C. §§ 701-706; 16 U.S.C. § 551; 16 U.S.C. § 1608; 42 U.S.C. § 4332; 16 U.S.C. § 3120)**

# INTRODUCTION

1. This action challenges a rule, 36 C.F.R. § 294.50-.51; 85 Fed. Reg. 68,688, 68,703 (Oct. 29, 2020) ("Exemption" or "2020 Exemption"), purporting to exempt the Tongass National Forest from the Roadless Area Conservation Rule, 36 C.F.R. §§ 294.10-.14 (2001); 66 Fed. Reg. 3244, 3272-73 (Jan. 12, 2001) ("Roadless Rule"). Plaintiffs bring this case under the Administrative Procedure Act (APA), 5 U.S.C. § 701-706, Organic Administration Act, 16 U.S.C. § 551, National Forest Management Act, 16 U.S.C. § 1608, National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, and Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3120.

2. The Tongass National Forest is central to the life ways of the Tlingit, Haida, and Tsimshian people who have lived in and depended on the forest since time immemorial. It is also home to black and brown bears, Alexander archipelago wolves, rare endemic species that are found nowhere else on earth, and towering stands of old-growth spruce and cedar trees.  Its free-flowing streams and rivers are the birthplace of 75 percent of the commercially-caught salmon in the region and 25 percent of the commercially-caught salmon on the west coast of the United States.  A major carbon sink, the Tongass is also a critical defense against climate change.  The decision at issue in this litigation puts all of this at risk.

3. Because it is a network of islands, the Tongass is a naturally fragmented ecosystem.  The inventoried roadless areas of the Tongass are relatively untouched

stretches of intact forest that provide important habitat for old-growth-dependent wildlife, protect healthy salmon streams and fisheries, and harbor carbon stores of global importance.

4.     The Roadless Rule, adopted in 2001, limits road construction and logging in inventoried roadless areas.  36 C.F.R. §§ 294.10-.14.  The Roadless Rule includes some exceptions, allowing road construction for some mining and community infrastructure projects.  The Rule applied to the Tongass, but in 2003, the Department of Agriculture temporarily exempted the Tongass from the Roadless Rule.  *See* 68 Fed. Reg. 75,136, 75,146 (Dec. 30, 2003).  In 2011, however, the District Court for the District of Alaska held that exemption unlawful and reinstated the Roadless Rule on the Tongass. *See Organized Vill. of Kake v. USDA*, 776 F. Supp. 2d 960 (D. Alaska 2011), *aff'd en banc* 795 F.3d 956 (9th Cir. 2015).

5.     On January 18, 2018, the State of Alaska submitted a petition to Defendants asking Defendants to initiate a rulemaking exempting the Tongass from the Roadless Rule.  In addition, the State asked Defendants to amend or revise the 2016 Tongass National Forest Land Management Plan Amendment ("Tongass Plan") to make roadless areas available for logging and increase harvest targets for old-growth logging. Defendants undertook a rulemaking and adopted a decision exempting the Tongass from the Roadless Rule, thereby eviscerating protections for 9.4 million acres of roadless areas in the Tongass and ignoring the tens of thousands of people who commented during the

rulemaking process, 96 percent of whom opposed the rollback of Roadless Rule protections.  In addition, the decision directed the Tongass Forest Supervisor to issue a ministerial notice of administrative change designating 188,000 acres of the Tongass suitable for logging.  36 C.F.R. § 294.51.

6.     In adopting the Exemption, Defendants stated that it would provide benefits for the timber industry without harming other industries, yet their analysis shows no increase in jobs or income resulting from logging.  Their final environmental impact statement (FEIS) assumes that opening 9.4 million acres of the Tongass to logging will not increase logging and therefore will not have any environmental effects beyond those analyzed in the environmental impact statement for the current Tongass Plan.  It further suggests that logging in remote roadless areas is not likely to be economic, yet opens those very areas to logging for the purpose of providing more economic timber sales. This contradictory analysis assumes both that the Exemption will benefit the timber industry and that it will have no effect on logging levels or the environment.  This renders the decision arbitrary and means the FEIS fails to provide an assessment of the full impacts of the Exemption.  In addition, Defendants failed, in their draft environmental impact statement (DEIS) and FEIS, to make findings addressing the impacts of the decision on subsistence users, as required under the Alaska National Interest Lands Conservation Act, and they failed to consider alternatives that would meet the purpose of the rulemaking while reducing the environmental effects of the action.

7. Plaintiffs include Alaska Native Tribes, tourism businesses, a commercial fisheries advocacy group, and nonprofit environmental organizations, all of whom depend on and advocate for an intact and healthy Tongass ecosystem. They seek declaratory and injunctive relief preventing Defendants from implementing or taking action in reliance on the Exemption, record of decision ("ROD"), or FEIS.

## JURISDICTION, RIGHT OF ACTION, AND VENUE

8. This court has jurisdiction under 28 U.S.C. § 1331 and may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201-02. Judicial review and vacatur of illegal agency actions is available under the Administrative Procedure Act, 5 U.S.C. §§ 701-06.

9. Venue is proper under 28 U.S.C. § 1391(e) because the Tongass National Forest is located within this District.

## THE PARTIES

### The Plaintiffs

10. Organized Village of Kake (OVK) is a federally recognized Indian Tribe organized under the authority of the Indian Reorganization Acts of 1934 and 1936. OVK represents more than 400 Tribal citizens who reside in Kake, on Kupreanof Island. OVK's mission is to strengthen Tribal community and culture. Its core values are respect, collaboration, endurance, safety, and security. One of OVK's highest priorities is to protect the Village's customary and traditional hunting, fishing, and gathering areas, which include roadless areas of the forest.

11.     Organized Village of Saxman (OVS), is a federally recognized Indian Tribe.  OVS represents the interests of its Tribal citizens, the majority of whom live in the community of Saxman on Revillagigedo Island.  OVS's mission is, in part, to protect the health, safety, social, economic, and cultural well-being of its tribal citizenship.  Protecting the lands that are central to the ways of life of Tribal citizens for hunting, fishing, and gathering is critical to OVS.

12.     Hoonah Indian Association (HIA) is a federally recognized Indian Tribe organized under the authority of the Indian Reorganization Acts of 1934 and 1936.  HIA has 1,210 Tribal citizens and presently provides services to approximately 450 Tribal citizens and other eligible Alaskan Native and American Indians residing within its direct services area, consisting principally of the community of Hoonah, Alaska.  HIA's mission is to protect and enhance the quality of the lives of all Xunaa Káawu through the exercise of self-governance by providing a combination of economic opportunities and a safety net of social services; to protect the culture and traditional practices of the Xuna Tlingit people, including the subsistence lifestyle; to respect and protect the spirit of the ancestors that have gone before and the future generations to come.

13.     Ketchikan Indian Community is a federally recognized Indian Tribe incorporated in 1940.  It is one of the largest Tribes in Southeast Alaska, representing more than 6,000 Tribal citizens, who are primarily of Tlingit, Haida, and Tsimshian clans.  Ketchikan Indian Community upholds the traditional Way of Life, the ancient and

sacred values of the ancestors. A cornerstone of this mission is to ensure Tribal citizens can hunt, fish, and harvest the nutritious food of the region. Tribal citizens use many traditional areas for hunting, fishing, and gathering, most in roadless areas. Ketchikan Indian Community strives to protect these natural resources to fulfill its duty as stewards of the earth, water, and air. Ketchikan Indian Community's mission includes stewarding, conserving, preserving, enhancing, and protecting places and customs that are of significant historical, cultural, and environmental importance by using traditional ecological and cultural knowledge and science.

14.     Klawock Cooperative Association is a federally recognized Indian Tribe on Prince of Wales Island. The Klawock Cooperative Association has been serving Klawock Tribal citizens since 1936, providing many programs for local residents to further Tribal citizens' way of life while keeping culture and heritage alive. Citizens of Klawock Cooperative Association use roadless areas and will be harmed by the Exemption.

15.     Women's Earth and Climate Action Network International (WECAN) is a solutions-based, non-profit organization established to engage women worldwide in policy advocacy, on-the-ground projects, direct action, trainings, and movement building for global climate justice. The organization was created to accelerate a global women's movement for the protection and defense of the Earth's diverse ecosystems and communities. WECAN focuses on short-term and long-term systemic change and

solutions to address the climate crisis and the root causes of environmental degradation and socio-economic inequalities.  Protecting the Tongass rainforest in Alaska from the threat of logging is a central focus of WECAN's Women for Forests program.  Through this program, which is led by Alaskan Native women living in the Tongass, WECAN is working to protect Tlingit, Haida, and Tsimshian traditional homelands, life-ways, and cultural survival in the Tongass from logging and other threats. In its efforts to fight logging, protect vital carbon sequestration through old-growth forests, and fight the repeal of the Roadless Rule in the Tongass, WECAN has facilitated Indigenous Women's Tongass Delegations to advocate at Congressional and United States Forest Service offices as well as other government agencies, organized action campaigns, petition drives, media productions and outreach, and public comment outreach.

16.     The Boat Company is the world's only conservation- and education-focused non-profit business.  The Boat Company was incorporated in Juneau, Alaska in 1980, originally as a program of The McIntosh Foundation.  It has operated two vessels—the M/V LISERON and the M/V MIST COVE—accommodating up to 24 passengers each for forty years, with two generations of McIntosh family members at its helm.  Throughout the summer season, The Boat Company offers week-long cruises through the archipelago of Southeast Alaska, providing its passengers opportunities to fish, hike, kayak, and view wildlife in the waters and old-growth forests of the Tongass. In so doing, The Boat Company educates its guests about the benefits of conserving and

preserving one of the Earth's last great wild and beautiful places. Both of The Boat Company's vessels transit Peril Straits each week. Clients enjoy scenery provided by roadless areas in Peril Straits and onshore activities at several locations on northeast Baranof Island and on north Kuiu Island during every trip.

17. UnCruise Adventures (UnCruise) is a wholly owned subsidiary of InnerSea Discoveries Alaska, Incorporated, with offices in Juneau, Alaska, and Seattle, Washington. UnCruise offers customers adventure cruise experiences around the world, with a focus in Southeast Alaska. In Southeast Alaska, UnCruise will operate six or seven ships in 2021–2022 with a passenger capacity ranging from 22-88, with typical itineraries ranging from 1-2 weeks in length. If operating as planned in 2021, UnCruise will employ roughly 350 seasonal employees in Juneau, Alaska. Half of the six Alaskan itineraries UnCruise offers will transit waterways adjacent to roadless areas along Kupreanof and Mitkof Islands, Wrangell and Etolin Islands, and Revillagigedo Island. The vessels make multiple stops at these islands where clients participate in remote recreation activities. Other itineraries include frequent stops at North Kuiu Island and areas along Peril Straits near Sitka. Logging in roadless areas adjacent to these waterways would prevent UnCruise from using multiple recreation spots on these islands and in some cases require changing travel routes as a result of adverse effects on scenery. Because all but one of UnCruise's ships carry too many passengers to be permitted in wilderness and primitive areas, the company's alternatives in many areas are often

limited to inventoried roadless areas. Roadless areas viewed and visited by UnCruise's clients comprise the majority of its inventory of recreation places that offer convenience, location, secure anchorages, and high-quality passenger experiences along the Southeast Alaska routes.

18.     Alaska Longline Fishermen's Association is a 501(c)(6) tax-exempt business league and Alaska non-profit corporation. Its purposes are to participate in sustainable fisheries practices, represent its members in policy forums, and provide scientific and socio-economic information, outreach and education services regarding Alaska's marine resources and fisheries to its members and the public. Its membership includes over two hundred individual commercial fishermen and roughly twenty-five other businesses, including seafood processors, fishing gear companies and marine repair businesses. Two-thirds of the members reside in Southeast Alaska. The remaining members live in other parts of Alaska or in other states and residencies range from the Bering Sea to the state of Florida. More than half of the commercial fishing members participate in Southeast Alaska salmon fisheries and depend on the productivity of salmon streams and aquatic systems within Tongass National Forest roadless areas. The Alaska Longline Fishermen's Association submitted detailed comments at each stage of the Alaska Roadless Rulemaking process supporting the no-action alternative and provides fishermen and seafood consumers with information about risks to salmon

associated with logging and logging road construction in its annual reports, in outreach meetings and presentations, and on its website.

19.     Southeast Alaska Conservation Council (SEACC) is a non-profit, member-based organization, with thousands of supporters and members, a majority of whom are Alaskans.  They come from many walks of life, including commercial fishermen, Alaska Natives, tourism and recreation business owners, small timber operators, and high-value-added manufacturers, hunters, and guides.  These members and supporters use and enjoy roadless areas for recreational, commercial, and traditional and cultural purposes. SEACC reaches out to its members and the general public through various means, including its website, Facebook and Instagram accounts, its newsletter "The Ravencall," other publications, action alerts, and public meetings.  SEACC's mission is to protect the special places of the world's largest temperate rainforest, promote conservation, and advocate for sustainability in human use of natural resources.  Inspired by the land, wildlife, cultures, and communities of Southeast Alaska, SEACC strives to ensure this interconnected whole exists for future generations.  To achieve its mission, SEACC and its members have worked to protect the Tongass National Forest, including its roadless areas, and advocated for balanced, sustainable use of the Tongass National Forest's renewable forest resources, including fish and wildlife and the commercial, recreational, and subsistence use of such resources for 50 years.  SEACC's public advocacy, education, and organizing efforts have created a legacy of effective partnerships with

leaders within the region, and across the state and country. SEACC's community forest planning efforts, promotion of restoration, stewardship, and renewable energy projects, and land protection advocacy all contribute to its efforts to address ecological, energy, and economic needs throughout the Tongass.

20.     The Natural Resources Defense Council (NRDC) is a membership organization that works to protect wildlife and wild places and to ensure a healthy environment for all life on earth. NRDC has more than 3.5 million members and online activists, including 375,000 dues-paying members, nearly 1,000 of them in the State of Alaska. NRDC's advocacy to protect the Tongass and keep it free from development dates back decades.

21.     Alaska Rainforest Defenders is a regional conservation non-profit corporation in Southeast Alaska. Alaska Rainforest Defenders was formerly known as Greater Southeast Alaska Conservation Community. The Alaska Rainforest Defenders stand together to defend and promote the biological integrity of Southeast Alaska's terrestrial, freshwater, and marine ecosystems for the benefit of current and future generations. Alaska Rainforest Defenders seeks to foster protection of Southeast Alaska's fish and wildlife and their habitat. The members of Alaska Rainforest Defenders use public lands throughout Southeast Alaska, including inventoried roadless areas, for commercial and subsistence fishing and hunting, professional scientific work, and a wide range of recreational activities.

22.     Alaska Wilderness League ("the League") is a non-profit organization with approximately 5,000 Alaskan members, as well as other members throughout the United States.  The League was founded in 1993 to advocate for the protection of Alaska's public lands and waters, which are threatened with environmental degradation.  The League is headquartered in Washington, DC and has an Alaska office in Anchorage.  The League works at the federal level on a variety of issues affecting Alaska's wild lands and waters including the Tongass National Forest.  The League has worked to preserve the wild lands and waters of the Tongass, including its roadless areas, by engaging citizens and decision makers to use their voices in fighting for conservation.  The League's rainforest program is focused on protecting old-growth forest in the Tongass.

23.     The Sierra Club is a national nonprofit organization with 67 chapters and more than 837,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  Members of the Sierra Club nationally, and Sierra Club's Alaska Chapter locally, use the Tongass National Forest for recreation, commercial and recreational fishing, subsistence, wildlife viewing, and other activities.  The Sierra Club has a long history of advocating for the protection of the Tongass and the roadless areas within the forest and has been active in creating, opposing, or supporting Tongass land

management actions for 45 years. The Alaska Chapter of the Sierra Club has approximately 1,800 members.

24. Defenders of Wildlife is a non-profit organization with its principal office in Washington, D.C. and field offices throughout the country. Defenders of Wildlife has approximately 1.8 million members and supporters, including over 6,000 in Alaska. The organization's primary mission is to further the protection of native wildlife and plants in their natural communities. Defenders of Wildlife advocated for the protection of Tongass species, including the Alexander Archipelago wolf, Queen Charlotte goshawk, northern flying squirrel, marten, and bats, as well as for Inventoried Roadless Areas, in comments during the 2016 Tongass Land Management Plan amendment process. It has also submitted detailed comments on proposed projects on the Tongass, including the Prince of Wales Landscape Level Analysis, the South Revilla Integrated Resource Project, the Central Tongass Project, and the Kuiu Island, Wrangell Island, and Twin Mountain II timber sales. It regularly provides information to its members and the public about the wildlife and habitat values of the Tongass National Forest.

25. The National Audubon Society (Audubon) is a national nonprofit conservation organization dedicated to protecting birds and the places they need, now and in the future, throughout the Americas, using science, advocacy, education, and on-the-ground conservation. Founded in 1905, Audubon has approximately 1.9 million members nationwide, including over 4,800 in Alaska. Among its many activities,

Audubon operates 41 nature centers, and has 23 state programs, including a state office in Anchorage, Alaska, and over 450 local chapters throughout the country, including five chapters in Alaska. Audubon has long advocated for preserving the roadless areas of the Tongass.

26. Center for Biological Diversity (the Center) is a national non-profit organization, with offices across the country and in La Paz, Mexico. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center has more than 81,800 members. The Center is actively involved in species and habitat protection issues throughout the United States. With regard to the Tongass, the Center has filed petitions to protect the Queen Charlotte goshawk and the Alexander Archipelago wolf under the Endangered Species Act. The Center carefully follows the fate of these and many other species that depend upon Tongass wildlands. The Center has long advocated protection of old-growth forests on the Tongass not only for their value as wildlife refugia but for their carbon storage, a key element in limiting the worst impacts of the ongoing climate crisis.

27. Friends of the Earth (FoE) is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation. Friends of the Earth is a membership organization consisting of nearly 120,000 members and more than 1.5 million activists nationwide, including more than 300 members who live in Alaska. It is also a member of Friends of the Earth-

International, which is a network of grassroots groups in 74 countries worldwide. Its mission is to protect our natural environment, including air, water, and land, to create a more healthy and just world, using public education, advocacy, legislative processes, and litigation. FoE has worked on the Roadless Rule since its creation and has supported its application in the Tongass through advocacy, media work and working with our members and activists. To date we have submitted more than 100,000 comments to federal agencies and members of Congress supporting the Roadless Rule in the Tongass and opposing any exceptions to the Rule in the region. Our members and activists recreate in the Tongass and will be harmed by any logging activity in the region.

28. The Wilderness Society (TWS), founded in 1935, is a national non-profit membership organization devoted to uniting people to protect America's wild places. It maintains eleven regional offices, including a six-person Alaska state office in Anchorage. TWS has more than one million members and supporters nationwide, a portion of which are in Alaska. Since the early 1980's, TWS has been involved in forest management and roadless area conservation issues in the Tongass National Forest through economic and ecological analysis, public education, collaborative organizing, legislative advocacy, and litigation. TWS was a leader in the movement to establish the Roadless Area Conservation Rule in 2001 and has vigorously defended the Rule against litigious, administrative, and legislative attacks ever since then. TWS has actively

participated in the public involvement process for the Alaska Roadless Rule for the past three years.

29.     Greenpeace, Inc. is a non-profit environmental organization headquartered in Washington, D.C.  Greenpeace's mission is to raise public awareness of environmental problems and promote changes that are essential to a green and peaceful future.  There are approximately 580,000 current Greenpeace members in the United States, over a thousand of whom live in Alaska.  The organization's involvement in forest issues concerning the National Forest System generally, and the Tongass in particular, goes back to the early 1990s.  Its concerns have included the effects of logging and associated road building on ecosystems, roadless areas, fish, and wildlife, and protection of the last remnants of old-growth forest in the United States.

30.     National Wildlife Federation (NWF), one of America's largest conservation organizations, has worked across the country to unite Americans from all walks of life in giving wildlife a voice for over eighty years.  NWF has 53 state and territorial affiliates, including an Alaska affiliate, and more than 6 million members and supporters, including hunters, anglers, gardeners, birders, hikers, campers, paddlers, and other outdoor enthusiasts.  NWF programs work to protect the 600 million acres of public lands owned by all Americans and have a longstanding interest in ensuring these lands are managed properly for fish, wildlife, and communities.  NWF commented on the draft roadless rule, and in 2020 NWF affiliates passed a resolution calling for Roadless Rule protections to

remain intact, and supporting future legislation that would work to codify the 2001 National Roadless Area Conservation Rule. Resolutions passed by our affiliates set the policy direction for the National Wildlife Federation.

31. Environment America was born from the U.S. Public Interest Research Group (U.S. PIRG). In the 1990's, U.S. PIRG called for the creation of the Roadless Rule and submitted nearly half of the then-record 1.6 million comments on the rule. In the years since, Environment America has used research, media, social media and public outreach to build support for protecting wild places in national forests, including the Tongass National Forest.

32. Plaintiffs include Alaska Native Tribes whose citizens and members have lived in and depended on the Tongass for thousands of years and who continue to depend on a healthy ecosystem to support their ways of life and traditional and cultural practices. Other Plaintiffs are businesses that depend on the roadless areas of the Tongass for their livelihoods, and still others include advocacy groups whose members reside near, visit, or otherwise use and enjoy the Tongass National Forest. Citizens of the plaintiff Tribes and members of the plaintiff organizations use lands previously protected by the Roadless Rule for cultural and traditional uses, recreation, research, wildlife viewing, photography, education, and aesthetic and spiritual purposes. They also depend on a healthy Tongass ecosystem, including in roadless areas, to support healthy fisheries, on which they depend for their livelihoods. The plaintiffs and their citizens and members derive scientific,

Case 1:20-cv-00011-SLG   Document 1   Filed 12/23/20   Page 18 of 50

recreational, aesthetic, and conservation benefits and enjoyment from their use of the roadless areas and from wildlife dependent on them. The activities authorized by Defendants' adoption of the Exemption will directly and irreparably injure these interests.

33.     Plaintiffs monitor the use of Tongass ecosystems and compliance with the laws respecting these ecosystems, educate their citizens, supporters, members, and the public concerning management of the ecosystems, and advocate policies and practices that conserve the natural values of the ecosystems. Plaintiffs cannot achieve these organizational purposes fully without adequate information and public participation in the processes required by law. The interests and organizational purposes of the plaintiffs are directly and irreparably injured by Defendants' violations of the laws as described in this complaint.

34.     Plaintiffs participate actively in the administrative processes established for management of the Tongass, and did so for this Exemption. Plaintiffs submitted comments during scoping and on the DEIS for the exemption. Plaintiffs have exhausted administrative remedies for the decision challenged in this complaint.

**The Defendants**

35.     Defendant Sonny Perdue is sued in his official capacity as Secretary of Agriculture. Secretary of Agriculture is the highest position within the Department of Agriculture, has ultimate responsibility for overseeing the Department and its agencies and ensuring their compliance with all applicable federal laws, and specific

responsibilities related to the administration of the Tongass.  Defendant Perdue is the official responsible for the FEIS and ROD.

36.    Defendant United States Department of Agriculture is the executive department responsible for overseeing the activities of the Forest Service. Defendant United States Department of Agriculture adopted the rule challenged in this action.

37.    Defendant Stephen Censky, or his successor, is sued in his official capacity as Deputy Secretary of Agriculture.  Deputy Secretary of Agriculture has responsibility for overseeing the Forest Service and ensuring its compliance with all applicable federal laws, and specific responsibilities related to the administration of the Tongass.  Defendant Censky signed the ROD challenged herein.

38.    Defendant United States Forest Service is the federal agency within the Department of Agriculture that issued the FEIS and ROD challenged in this action.

## FACTUAL BACKGROUND

### The Tongass National Forest

39.    The Tongass, located in Southeast Alaska, is this country's largest National Forest.  The Tongass contains approximately 29 percent of the world's remaining unlogged coastal temperate rainforests, a rare ecosystem type globally.  In addition, the amount of carbon it stores is equivalent to eight percent of the amount stored by all of the national forests in the lower 48 states, combined.

40.     The Tongass is a naturally fragmented, island ecosystem.  Logging has been heavily concentrated in certain areas of the forest.  Only about 39 percent of the productive forests in the region were part of contiguous old-growth forest landscapes prior to industrial logging, and today, only about 28 percent remain in contiguous landscapes, while the remaining 72 percent of the old-growth forests in the region are in fragmented patches.  Over 48 percent of all logging in Southeast Alaska has occurred on Prince of Wales Island and neighboring islands, though this island group contained just over 22 percent of all productive forests prior to industrial logging.  Contiguous old-growth landscapes on North Prince of Wales Island today have been reduced to just over 20 percent of their historical extent.  The Kupreanof/Mitkof biogeographic region and East Baranof region have each lost over 55 percent of their contiguous old-growth forests, and West Baranof has sustained a 50 percent loss.  The regions that have been logged most heavily are also the regions that historically had the highest biological values on the Tongass and the regions at greatest risk today.

41.     The majority of the intact habitat on the Tongass today is found in roadless areas.

42.     The forest is the traditional homeland of the Tlingit, Haida, and Tsimshian people who rely on the forest for their culture and ways of life.  Citizens and members of Alaska Native Tribes, including Plaintiff Tribes, rely on lands in the Tongass, including roadless areas, for fishing, hunting, and gathering foods and traditional medicines.  These

foods comprise a significant portion of household resources. Tribal citizens and members also use cedar and other types of wood for traditional carvings and important cultural uses.

43.     Old-growth forests provide particularly important habitat for many species, including Queen Charlotte goshawks, Alexander Archipelago wolves, marten, black and brown bears, Sitka black-tailed deer, and a variety of endemic species found only on a small number of islands.

44.     Wildlife depend on continuous blocks of intact habitat. Logging fragments habitat, isolating populations of wildlife and reducing populations. Building roads, whether for logging or other purposes, also fragments habitat and can increase access for hunters and trappers, negatively affecting wildlife sensitive to these pressures. This increased access also results in increased competition for resources on which Tribes depend, resulting in restrictions on subsistence resources.

45.     Endemic species, such as Prince of Wales flying squirrels, Prince of Wales spruce grouse, and Pacific marten, which may exist on only one island or a few islands, are particularly at risk from logging and habitat fragmentation because of their constricted ranges and, in some cases, limited dispersal capabilities.

46.     The visitor industry and seafood industry are the largest sectors of the natural resource-based economy in Southeast Alaska. Together, they constitute over 90 percent of resource-dependent employment in the region, while the wood products

industry makes up only three percent of regional employment and mining makes up the remaining seven percent.

47.     The Tongass is also the source of 75 percent of the commercially-caught salmon in the region.  The seafood industry is the second largest private sector contributor to the regional economy in terms of earnings.  It provides nearly 4,000 jobs for the region and almost $240 million in earnings, constituting eight percent of employment and 10 percent of earnings for the region.

48.     Salmon are also significant for subsistence fishing, with 95 percent of rural households relying on wild fish. In some communities, residents harvest up to 500 pounds per capita of wild foods.

49.     Roads pose the greatest risk to fish resources on the Tongass.  Roads contribute sediment, change stream channel characteristics, contribute to erosion and scouring, affect stream bank stability, and create barriers to fish passage.

50.     There are currently nearly 800 damaged culverts in the Prince of Wales and Central Tongass regions blocking fish passage on at least 170 miles of streams.  These blocked culverts are part of a $5 billion maintenance backlog on the Tongass.  Tongass-wide, blocked culverts result in losses of $2.5 million each year to commercial fishermen.

51.     The visitor industry is the largest private sector contributor to regional employment after government.  The visitor industry provides over 8,000 jobs, 18 percent

of regional employment, and over $249 million in earnings, 11 percent of regional

earnings, each year.

52.     Small tour operators in particular are dependent on roadless areas to

provide their clients with remote experiences.

53.     Defendants admit that logging in roadless areas could affect the Forest

Service's ability to meet demand for tourism.

54.     By contrast, the Defendants estimate the timber industry supplies only 337

jobs, just one percent of regional employment, and $18.8 million, one percent of

earnings, in the region today.  Defendants project that, even with complete elimination of

the Roadless Rule on the Tongass, the rule will not result in any new timber industry jobs

on the Tongass over the next 100 years and regional economic impacts from the timber

industry will remain the same with the Exemption as without.  FEIS at 3-55.

**The Roadless Rule and the 2016 Tongass Plan**

55.     In 1999, the Forest Service began a renewed nationwide process to evaluate

the values of and provide management direction for all inventoried roadless areas in the

National Forest System.

56.     In May 2000, the Forest Service published a DEIS for the Roadless Rule.

The EIS considered alternatives for protecting inventoried roadless areas within the

National Forest System, including an alternative that would have exempted the Tongass

from the rule.  After considering over one million public comments that overwhelmingly

supported adoption of the rule including for the Tongass, the Forest Service published the FEIS for the Roadless Rule in November 2000 ("Roadless Rule FEIS").

57.     In January of 2001, the Secretary of Agriculture adopted the Roadless Rule. This rule, with specific exceptions, prohibited logging and road building in inventoried roadless areas throughout the National Forest System.  *See* 66 Fed. Reg. 3244, 3272-73. In adopting the Roadless Rule, the Secretary relied on the fact that "[u]ndisturbed landscapes provide a variety of monetary and non-monetary benefits to the public.  Many of these benefits are associated with the protection of ecological, social, and economic values in inventoried roadless areas." *Id*. at 3267.  The Roadless Rule was adopted in compliance with all applicable laws.

58.     The Roadless Rule includes exemptions allowing the construction of roads for mines, Federal-aid highways, and other forms of community infrastructure.  Pursuant to these exemptions, in the Tongass, the Chief of the Forest Service has approved at least 57 projects in roadless areas, including mining projects, hydropower and intertie projects, road re-alignment and reconstruction, a Coast Guard GPS antenna, an aerial tram, National Guard training activities, a geothermal lease, and road easements.  Most projects are approved within one month.

59.     The Roadless Rule applied to the Tongass initially, but in 2003, the Department of Agriculture published a final rule providing for a temporary exemption of the Tongass from the Roadless Rule.  *See* 68 Fed. Reg. at 75,146.  This temporary

exemption remained in effect until 2011, when the District Court for the District of Alaska, in a decision later upheld by an *en banc* panel of the Ninth Circuit Court of Appeals, held that the Forest Service acted arbitrarily in adopting the 2003 exemption and reinstated the Roadless Rule on the Tongass. *See Organized Vill. of Kake*, 776 F. Supp. 2d 960.

60.     When the Tongass Plan was adopted in 2016, the Forest Service stated, in its decision adopting the Amendment, "the best way to bring stability to the management of roadless areas on the Tongass is to not recommend any modifications to the Roadless Rule.  Harvest in roadless areas is not necessary to meet the purpose and need of the amendment."  Tongass Plan ROD at 19.  The Forest Service further explained that the Tongass Plan protected roadless areas independent of and in addition to the protection provided under the Roadless Rule and a plan amendment would be required to allow logging in roadless areas.

61.     The Forest Plan states a projected timber sale quantity (PTSQ) of 46 million board feet (MMBF) initially, but that number would increase to 98 MMBF after about 18 years of implementation of the Plan.  The PTSQ is not a cap on the amount of logging under the Plan; it is an estimate of the quantity of timber expected to be sold during the plan period.

62.     In addition to the habitat protection provided by the Roadless Rule, the Tongass Plan relies on a habitat conservation strategy to mitigate the effects of logging

on wildlife. The strategy requires the retention of reserves of old growth connected by smaller patches of habitat. Reserves are regularly modified through plan amendments to accommodate timber sales, however, and many areas of the forest are highly fragmented.

63. Scientists have called the effectiveness of the habitat conservation strategy into question, particularly for Queen Charlotte goshawks and endemic species like Prince of Wales flying squirrels.

64. In an evaluation of the integrity of the habitat conservation strategy for the Tongass Plan, the Forest Service specifically recognized that the habitat conservation strategy was enhanced because "most importantly, with the 2001 Roadless Rule in effect, inventoried roadless areas (approximately 2,143,000 acres of development [Land Use Designations] in roadless areas containing about 823,000 acres of [productive old growth]) make a major contribution to the maintenance of ecological function on the Tongass National Forest but do so outside of the elements of the conservation strategy." Tongass Plan FEIS at D-20. Further, the analysis identified that changes made to the habitat conservation strategy under the 2016 amendment could reduce the ability of certain features of the habitat conservation strategy, including beach and estuary fringe, riparian management areas, and old-growth habitat LUDs, to function as intended under the habitat conservation strategy. These effects would be localized, but could affect habitat important for goshawks, bears, deer, wolves, anadromous fish, and other animals,

particularly in areas already fragmented by past logging. Offsetting these effects, the

analysis concluded,

> [t]he additional area of" productive old growth protected under the 2001
> Roadless Rule "will function as additional reserves, enhancing the
> existing reserves, and increasing the effectiveness of the matrix when
> located around harvest units. As such, the substantially greater spatial
> extent of old-growth forest on the landscape and fewer roads across the
> planning area would outweigh the local, adverse effects of young-growth
> harvest proposed in the Old-growth Habitat LUD, the beach and estuary
> fringe, and [riparian management areas] that would result under the action
> alternatives . . . .

*Id*. at D-20

65.     In addition, the Forest Plan established a goal of transitioning from a

primarily old-growth logging program to a predominantly young-growth logging

program over a period of fifteen years. The young growth transition is a goal, but it is not

a binding requirement. During the first decade of the transition, annual sales were to

average 34 MMBF of old growth and 12 MMBF of young growth.

66.     In the three years since the 2016 Tongass Plan amendment was adopted, the

Forest Service has not complied with this Tongass Plan direction. In 2017, the Forest

Service sold 30 MMBF of young growth and only one MMBF of old growth, but in 2018,

sold entirely old growth (9.3 MMBF). In addition, in 2018, the Forest Service offered,

but was not able to sell, another 20.8 MMBF of old growth and 2.8 MMBF of young

growth. In other words, it offered a total of 30.1 MMBF of old growth and only 2.8

MMBF of young growth (the same 2.8 MMBF offered, but not sold, the previous year).

In 2019, the Forest Service sold 2.9 MMBF of old growth and 2.4 MMBF of young

growth. It also attempted to offer another 24.8 MMBF of old growth in the Twin Mountain timber sale, but was enjoined from doing so in *SEACC v. U.S. Forest Serv.*, 443 F. Supp. 3d 995 (D. Alaska 2020). Recent and upcoming timber sale analyses similarly emphasize continuing large old-growth sales. The Forest Service is currently preparing an EIS for the Twin Mountain II timber sale, in which it expects to offer 42 MMBF of old growth timber. 85 Fed. Reg. 56,576 (Sept. 14, 2020). Similarly, it recently released a DEIS for the South Revillagigedo Integrated Resource Project, which would authorize logging of up to 70 MMBF of old growth and only 22 MMBF of young growth over 15 years. 84 Fed. Reg. 31288, 31289 (July 1, 2019). Defendants are not making the transition away from old-growth logging contemplated in the Forest Plan.

**Environmental Documentation and Final Rule**

67.     On January 18, 2018, the State of Alaska submitted a petition to Defendants asking Defendants to exempt the Tongass National Forest, in its entirety, from the Roadless Rule and amend the Tongass Plan to revise the young-growth transition to provide for increased old-growth logging.

68.     Defendants accepted the state's petition and published a DEIS for the Alaska Roadless Rulemaking in October 2019. In the DEIS, Defendants considered six alternatives. With the exception of the No Action Alternative, each alternative exempted increasingly larger portions of the inventoried roadless areas of the Tongass to logging

and road-building.  Defendants identified Alternative 6, the full exemption alternative, as the preferred action.

69.     Six Tribes acted as cooperating agencies during the DEIS process:  Angoon Community Association, Central Council Tlingit and Haida Indian Tribes of Alaska, Hoonah Indian Association, Hydaburg Cooperative Association, Organized Village of Kake, and Organized Village of Kasaan.  The State of Alaska was also a cooperating agency.

70.     Although Defendants awarded a $2 million grant to the State of Alaska for its work as a cooperating agency in the Alaska Roadless Rulemaking process, Defendants offered no funding to cooperating Tribes.  In a report published in December 2020, the Office of Inspector General found that the Forest Service acted unlawfully by awarding funding to the State of Alaska because it used an inappropriate funding source and did not offer funding to other interested parties, such as Tribes.  *See* USDA Office of Inspector Gen., Inspection Report 08801-0001-24, Forest Service Grant for Roadless Area Management in the State of Alaska at 3 (2020).

71.     Between the draft and final EIS, Defendants held hearings for Angoon, Craig, Ketchikan, Petersburg, Sitka, Tenakee Springs, Wrangell, Yakutat, Point Baker, Hoonah, Skagway, Gustavus, Haines, Thorne Bay, Kake, Kasaan, Hydaburg, and Pelican.  Although Defendants characterized these hearings as subsistence hearings in the FEIS, Defendants did not present subsistence findings at these hearings.

72. Further, in their discussion of the effects of the action on community harvest areas in the DEIS and FEIS, Defendants used maps of harvest areas to estimate the effects of the Exemption on community hunting areas. Defendants refused to base their analysis of the effects of the Exemption on the Organized Village of Kake on a map of traditional use areas that Organized Village of Kake submitted to Defendants. Defendants acknowledged that communities, including Organized Village of Kake, use larger areas than those shown in the maps Defendants actually used, but nonetheless refused to use maps showing the areas of harvest, artificially constraining its analysis.

73. Defendants also rejected requests from Tribes to wait to engage in government-to-government consultation until it is safe to hold in-person consultations, after the Covid-19 pandemic. Instead, Defendants held virtual consultations. Plaintiff Tribes that participated in these meetings participated only to make it clear that they did not consider the meetings to be consultations.

74. After the release of the DEIS, the Organized Village of Kake withdrew as a cooperating agency because Defendants did not meaningfully consider the Tribe's input in the process.

75. In September 2020, Defendants published their FEIS. In the FEIS, Defendants stated the purpose and need for the action as follows: "In response to the State of Alaska's petition for rulemaking, a long-term, durable approach to roadless area management is desired that accommodates the unique biological, social, and economic

situation found in and around the Tongass. The Tongass is unique from other national forests with respect to size, percentage of IRAs, amount of NFS lands and subsequent dependency of 32 communities on federal lands (the Tongass comprises almost 80 percent of Southeast Alaska), and unique Alaska and Tongass specific statutory considerations . . . ." FEIS at 1-5.

76.     The six alternatives considered in the FEIS are nearly identical to the alternatives considered in the DEIS. Alternative 1, the No Action Alternative, leaves the Roadless Rule in effect on the Tongass. Alternatives 2 through 5 create additional categories of roadless areas, called "Alaska Roadless Areas," but all of these categories allow more development in roadless areas than the Roadless Rule would allow. Each alternative opens an increasing portion of the roadless areas of the Tongass to logging and road building, with Alternative 6, the preferred alternative, exempting the Tongass, in its entirety, from the Roadless Rule.

77.     Defendants failed to consider an alternative that would accomplish that purpose by identifying timber-dependent communities and tailoring measures to meet those communities' needs while minimizing the environmental effects of the action.

78.     In the FEIS, Defendants repeatedly conclude that the effect of exempting the entire Tongass from the Roadless Rule and removing protection from all 9.4 million acres of roadless areas in the forest will be almost the same as the effects of logging under the Tongass Plan. This conclusion is based on three assumptions: 1) the overall

level of logging will not increase, only the location of logging will shift; 2) the young-growth transition will remain in effect and will limit the amount of logging in roadless areas; and 3) the habitat conservation strategy will protect wildlife habitat and populations in the forest even without the additional protection provided by the Roadless Rule.

79. After the publication of the FEIS, the remaining five Tribes withdrew as cooperating agencies in protest over Defendants' selection of the Exemption.

80. On October 29, 2020, Defendants published a final rule adopting Alternative 6, the full exemption. 85 Fed. Reg. 68,688 (Oct. 29, 2020). The final rule also directs the forest supervisor to issue a ministerial notice of administrative change designating 188,000 acres of roadless areas suitable for logging under the Tongass Plan.

81. Defendants stated that no subsistence determination is required under ANILCA § 810, but nonetheless included a cursory determination in the ROD, made, "in the spirit of cooperation." FEIS at 3-252.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of ANILCA)

82. Plaintiffs incorporate by reference all preceding paragraphs.

83. In ANILCA, Congress found that "the continuation of the opportunity for a subsistence way of life by residents of rural Alaska require[s] that an administrative structure be established for the purpose of enabling rural residents who have personal

*Organized Village of Kake et al. v. U.S. Dep't. of Agriculture et al.,*
Case No. 1:20-cv-00011-HRH

32

knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska." ANILCA § 801, 16 U.S.C. § 3111(5).

84.     Congress thus declared a national policy that "the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands." ANILCA § 802, 16 U.S.C. § 3112(1).

85.     To accomplish this goal, when a federal agency with primary jurisdiction over public lands is considering whether to "withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition" of such public lands, the head of the agency must evaluate the effects of "such use, occupancy or disposition" on subsistence. ANILCA § 810, 16 U.S.C. § 3120.

86.     If the action under consideration "would significantly restrict subsistence uses," then the agency head cannot proceed until they a) give notices to the appropriate State agency, local committees, and regional councils; b) give notice of and hold a hearing in the vicinity of the affected area; and c) provide a determination about the nature of the restriction on subsistence uses. ANILCA § 810(a)(1)-(3), 16 U.S.C. § 3120(a)(1)-(3).

87.     In particular, the agency head must determine that "(A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles

for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions." ANILCA § 810(a)(3), 16 U.S.C. § 3120(a)(3).

88.     If the Secretary of Agriculture is required to prepare an EIS under NEPA for the proposed action, then "he shall provide the notice and hearing and include the findings required by [ANILCA § 810(a)] as part of such environmental impact statement."  ANILCA § 810(b), 16 U.S.C. § 3120(b).

89.     The Tongass National Forest is public land managed by the Secretary of Agriculture through the Forest Service.

90.     Exempting the Tongass from the Roadless Rule permits a use of public lands because it allows the use or occupancy of public lands by, among other things, lifting prohibitions on and allowing for new road construction, additional access to public lands, and timber sales on the Tongass National Forest.

91.     Defendants were required to prepare an EIS before promulgating the Exemption.

92.     Defendants, in their ROD for the Exemption, concluded the "final rule may eventually indirectly result in a significant restriction of subsistence use of deer by

increasing overall competition for the subsistence resource by urban and rural residents." 85 Fed. Reg. at 68,692.

93.     Despite this finding of a potentially significant restriction, Defendants failed to include in either the draft or final EIS, the findings required under ANILCA § 810(a).

94.     Instead, Defendants included in the ROD—after all opportunities for public participation had passed—a conclusory statement purporting to constitute the subsistence of a determination under ANILCA § 810(a)(3).  The ROD asserts that the Exemption's restriction on subsistence is necessary and consistent with sound land management, but it provides no evidence or rationale for that determination.  85 Fed. Reg. at 68,692-93. Similarly, the ROD asserts that the Exemption uses the amount of public land necessary to accomplish the action, but it only restates what the Exemption does without providing evidence or a justification that opening all roadless areas is necessary to a accomplish the Defendants' articulated purpose.  85 Fed. Reg. at 68,693.  And the ROD asserts that the agency took reasonable steps to minimize adverse impacts to subsistence, but, again, the statement provides no explanation of or evidence as to what these steps are.  85 Fed. Reg. at 68,693.  The ROD only points to what the Tongass Plan did and what the Forest Service may do in the future at the site-specific level.  None of these determinations incorporate or reference analysis in the FEIS or elsewhere that supports the substance of the assertions.

95.     In so proceeding, Defendants have deprived the public and decisionmakers

of any opportunity to consider and comment on their ANILCA § 810(a)(3)

determinations.  The agency has thus denied "rural residents who have personal

knowledge of local conditions and requirements to have a meaningful role in the

management of fish and wildlife and of subsistence uses on the public lands in Alaska."

ANILCA § 801(5).  As a consequence, Defendants have frustrated Congress' aim that

using Alaska public lands "cause the least adverse impact possible" on those who depend

on subsistence resources.  ANILCA § 802, 16 U.S.C. § 3212.

96.     Defendants' failure to include in the Exemption's draft and final EIS

findings about the Exemption's potentially significant restriction of subsistence uses was

not in accordance with law, and arbitrary and capricious, violating ANILCA § 810(a),

16 U.S.C. § 3120(a), and the APA, 5 U.S.C. § 706(2)(A).

97.     Defendants' failure to make an evidence-based and minimally rational

determination about the necessity of the Exemption's potentially significant restrictions

on subsistence is arbitrary and capricious and not in accordance with law, violating

ANILCA § 810(a), 16 U.S.C. § 3120(a), and the APA, 5 U.S.C. § 706(2)(A).

## COUNT II
### (Arbitrary and capricious decisionmaking)

98.     Plaintiffs repeat and incorporate by reference the preceding paragraphs.

99.     Pursuant to, inter alia, the APA, 5 U.S.C. § 706(2)(A), federal agency

decisionmaking must not be "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." Agency decisions are unlawfully arbitrary and capricious if, among other things, the agency ignores or contradicts earlier factual findings without reasoned explanation or offers an explanation for a decision that runs counter to the evidence before it. One way an agency's explanation runs counter to the evidence is when, lacking probative data for its conclusion, it fails to provide an adequate justification for acting before engaging in a search for further evidence.

100.    In adopting and amending the Roadless Rule, the Secretary of Agriculture acted under authority of the Organic Administration Act to adopt rules to "insure the objects of" the national forests and "to preserve the forests thereon from destruction," 16 U.S.C. § 551, and the requirement of the National Forest Management Act that he install "a proper system of transportation . . . to meet anticipated needs on an economical and environmentally sound basis . . . ." 16 U.S.C. § 1608(a).

101.    In its October 29, 2020 ROD exempting the Tongass National Forest from the 2001 Roadless Rule, Defendants cited as principal reasons for the Exemption: "a policy change for the Tongass National Forest can be made without major adverse impacts to the recreation, tourism, and fishing industries, while providing benefits to the timber and mining industries, increasing opportunities for community infrastructure, and eliminating unnecessary regulations." 85 Fed. Reg. at 68,691. The Defendants asserted these benefits could be accomplished with minimal ecosystem and wildlife impact in part because the Tongass Plan's habitat conservation area strategy would continue to protect

old growth habitat and wildlife.  *Id.* at 68,693.  Several essential stated rationales for the Exemption are inconsistent with the record, contradict without adequate explanation previous findings of the Defendants, or were adopted without support and without an explanation for acting without developing supportive evidence.

102.    The timber industry comprises only one percent of total employment and earnings in Southeast Alaska.  With respect to the Tongass, Defendants' analysis shows that a total of 62 jobs in the region are dependent on federal timber sales.  Defendants also assert that the Exemption will not increase the number of jobs or direct income for the timber industry.    Further, Defendants assert in their FEIS that the addition of more remote acres of suitable timber under the Alternative 6 full exemption will not result in increased options for economic timber sales.

103.    Defendants' assertion that the Exemption will benefit the mining industry is also contrary to Defendants' own assertions and the evidence in the record.  The Roadless Rule does not prohibit mining in roadless areas.  It also provides exceptions for roads associated with mining.

104.    In the FEIS, Defendants acknowledged that "[c]hanges in roadless management are, therefore, not expected to affect existing or future locatable mineral exploration or mining activities on the Forest."  FEIS at ES-14.

105.    The Roadless Rule also allows various types of community infrastructure projects to occur in inventoried roadless areas, including energy development, Federal

Aid Highways, and other projects.  36 C.F.R. § 294.12(b); 66 Fed. Reg. at 3272.

Defendants acknowledged this in the ROD for the Exemption, stating "the 2001 Roadless

Rule would not seem to be the impediment to certain vital infrastructure and energy

projects as claimed by some, given that some infrastructure and energy development is

allowed under various statutes and/or the 2001 Roadless Rule."  85 Fed. Reg. at 68,691.

In fact, neither the ROD nor the FEIS identifies a single infrastructure project that is, or

ever has been, impeded by, or could benefit from revocation of, the Roadless Rule.  This

directly contradicts Defendants' statement that the exemption will increase opportunities

for community infrastructure.  *Id.*

106.    Additionally, neither the ROD nor the FEIS identifies any way in which

roadless areas will be less regulated under the Exemption.

107.    The Defendants concluded that the Exemption could be adopted without

harm to ecosystem values and wildlife of the Tongass because, in important part, those

values would be protected by the habitat conservation strategy of the Tongass Plan.

When it adopted the Roadless Rule in 2001, however, the Department of Agriculture

recognized the importance of inventoried roadless areas in the Tongass, in addition to the

habitat protected by the habitat conservation strategy in the then-applicable forest plan, as

biological strongholds for terrestrial and aquatic wildlife, and as undisturbed habitat for

recreation.  66 Fed. Reg. at 3245.  The 2001 decision therefore recognized that, even in

light of the then-applicable plan's strategy, the "unique and sensitive ecological character

of the Tongass National Forest" were best protected over the long term through the application of the Roadless Rule. *Id.* at 3254. The habitat conservation strategy in effect in 2001 was essentially the same as the habitat conservation strategy in effect today. In 2016, when the Forest Service adopted the Tongass Plan Amendment now in effect, the Forest Service similarly recognized that the Roadless Rule made "a major contribution to the maintenance of ecological function of the Tongass National Forest" in addition to the effect of the habitat conservation strategy. TLMP FEIS at D-20. Defendants' contradictory conclusion in its October 2020 decision that exempting the Tongass from the Roadless Rule would not have adverse effects rests on arbitrary assumptions that non-binding elements of the Tongass Plan will limit old-growth logging in roadless areas now open to logging.

108. For these reasons, the rationales Defendants provided for exempting the Tongass from the Roadless Rule are contradicted by the agency's own conclusions and evidence in the record. Additionally, Defendants did not provide an adequate explanation for rescinding the Roadless Rule without more effort to develop actual evidence to support its rationales. Therefore, the October 29, 2020 decision to exempt the Tongass from the Roadless Rule was an arbitrary and capricious exercise of their authority and responsibilities under the Organic Administration Act and the National Forest Management Act, in violation of 5 U.S.C. § 706(2)(A).

# COUNT III
## (Failure to Consider a Range of Reasonable Alternatives)

109.    Plaintiffs incorporate by reference all preceding paragraphs.

110.    NEPA establishes a national policy that federal agencies "use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a). NEPA directs that "to the fullest extent possible" all public laws of the United States "be interpreted and administered in accordance" with these policies. *Id.* § 4332(1).

111.    In furtherance of these national policies, NEPA directs that federal agencies—including Defendants—study alternatives to their proposed actions. *Id.* §§ 4332(2)(C)(iii) & (E); *see also* 40 C.F.R. § 1502.14 (1978).[1] These must, to the fullest extent possible, include "reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." *Id.* § 1500.2(e); *see also* 40 C.F.R. § 1502.1 ("The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. It shall . . . inform decisionmakers and the public of the reasonable

---

[1] The regulations cited here are the version that Defendant United States Department of Agriculture determined apply to the Alaska Rulemaking. FEIS, p. 1-1 n.8. The regulations have recently been amended, but the amendments do not by their terms apply to NEPA processes commenced before September 15, 2020. *See* 40 C.F.R. § 1506.13 (2020).

alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.")[2]

112.    In the statement of purpose and need for its FEIS, Defendants identified two principal reasons for loosening or waiving Roadless Rule protections for the Tongass.  First, they said they wanted a durable and long-lasting solution for conservation and management of Tongass roadless areas.  Second, they said, they wanted to respond to the unique dependency of 32 communities on federal lands in the region.

113.    NEPA obligated Defendants to develop ways to pursue this purpose and need while minimizing harm to the environment.  In its FEIS and numerous previous processes and documents, Defendants found that roadless areas contribute importantly to environmental quality and that logging and associated road construction in roadless areas adversely affect the environment.  Partly as a result of these determinations, the agency was required to develop, take comment on, and consider alternatives that would only cause that harm to the minimum extent required to respond to the unique dependency of communities on federal lands.

114.    The FEIS makes clear that if there are communities in the region with unique dependency on federal lands logging, as opposed to other uses like customary and

---

[2] The 2020 revision to this regulation, applicable to processes commenced after Sept. 14, 2020, read:  ". . . shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment."

traditional ways of life, tourism, hunting, and fishing, they are rare.  It reports that, of

45,642 jobs in Southeast Alaska in 2018, only 62 related to logging and milling federal

timber.  FEIS at 3-32, 3-34.  The FEIS found that "resource extraction remains important

in some rural communities," FEIS p. ES-3, but failed to identify any in which the

extraction of trees remains important.

  115. Assuming these communities do exist, NEPA required that Defendants

consider alternatives that only opened roadless areas to the extent needed to respond to

their dependence on federal logging and milling.  It would have had first to identify the

communities.  Then it would have needed to consider addressing their dependence by

increasing employment without opening roadless areas, for example by eliminating or

reducing the export of Tongass timber as whole logs without local processing.  If it then

deemed opening some roadless areas still necessary, it would have had to consider

opening only those, and only to the extent required to respond to the dependency of the

identified communities, rather than across the Tongass.  And it would have needed to

consider maintaining as much as possible the environmental benefits it previously

identified from national level regulation of roadless areas, by setting maximum allowable

logging levels within them and prohibiting local decisionmakers from either expanding

the acreage deemed suitable for logging or further reducing the area protected by the

Roadless Rule.

116. Because no action alternative considers these environment-protecting ways of responding to any unique dependence of communities on federal lands logging Defendants violated NEPA, 42 U.S.C. § 4332 and 40 C.F.R. § 1502.1.

## COUNT IV
### (Arbitrary analysis of effects)

117. Plaintiffs repeat and incorporate by reference the preceding paragraphs.

118. In an EIS, federal agencies must discuss the potentially significant "environmental impacts of the alternatives, including the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented." 40 C.F.R. § 1502.16; 42 U.S.C. § 4332. This includes discussions of "direct effects and their significance," "indirect effects and their significance," and "cumulative" impacts. 40 C.F.R. §§ 1502.16, 1508.8, 1508.25(a)(2).

119. An agency cannot meet its NEPA obligation by relying on inaccurate assumptions or data in its analysis of the environmental effects of an action.

120. Defendants base the analysis of environmental effects in the FEIS on three assumptions: 1) the overall amount of logging on the Tongass will not increase; 2) the young-growth transition will limit the effects of logging in inventoried roadless areas; and 3) the habitat conservation strategy will fully protect wildlife and their habitats despite increased fragmentation and logging in roadless areas. Each of these assumptions is inaccurate or incomplete, and Defendants' analysis of the effects of the exemption is therefore inadequate because Defendants have not disclosed the potential effects of

opening areas across 9.4 million acres of the Tongass to logging and associated road-building. The analysis: (1) assumes that the rulemaking, despite aiming to assist assertedly logging-dependent communities by greatly increasing the area available for logging will not result in any additional logging; (2) is inconsistent with logging trends; and (3) conflicts with prior Forest Service conclusions about the need for the Roadless Rule.

121. First, Defendants repeatedly conclude in the FEIS that the overall level of logging will not increase with the elimination of the Roadless Rule, and therefore the forest-wide effects of the exemption will be almost the same as they would be if the Roadless Rule remained in effect. According to Defendants, logging levels will remain the same—no matter how much land Defendants open to logging—because logging is based on the projected timber sale quantity described in the Tongass Plan. Defendants admit that the projected timber sale quantity, "an estimate of the quantity of timber expected to be sold during the plan period," is not a binding limit on the amount of timber offered or sold each year. TLMP at 7-44 (defining term). Defendants fail to assess the impacts if logging levels increase beyond the projection in the Tongass Plan.

122. Moreover, even if overall levels of logging do not increase, logging will shift from roaded areas to roadless areas under the exemption. *See, e.g.*, FEIS at 3-4 ("Although the acres of harvest do not change, the distribution of that harvest around the Forest is likely to change with each alternative because of shifting patterns of suitable

timber lands.").  In adopting the 2001 Roadless Rule, the Department of Agriculture recognized that roadless areas protect important habitat and watersheds and the effects of logging in these areas are different than the effects of logging in already roaded areas. The rule "prohibit[ed] road construction, reconstruction, and timber harvest in inventoried roadless areas because they have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area values and characteristics."  66 Fed. Reg. at 3244.  With respect to the Tongass, the Department of Agriculture specifically found that "the forest's high degree of overall ecosystem health . . . would most effectively [be] protect[ed]" by applying the Roadless Rule to the Tongass.  66 Fed. Reg. at 3254.  Nonetheless, the EIS for the 2020 Exemption contradicts these conclusions, assuming, without explanation, that shifting logging to roadless areas will not be significantly different than logging in roaded areas.

123.    Similarly, despite Defendants' decision to exempt all roadless areas on the Tongass from the Roadless Rule, immediately opening 168,000 acres of old growth to logging and potentially opening millions of additional acres, Defendants repeatedly conclude that the young-growth transition direction in the Tongass Plan "will transition harvest locations away from roadless areas containing old growth and into areas where timber harvest has previously occurred, avoiding or reducing effects to roadless areas." 85 Fed. Reg. at 68,694.  The young growth transition described in the Tongass Plan, however, sets an expectation, but does not provide any binding limitation on levels of

old-growth logging. During the first four years of implementing the Tongass Plan, Defendants have offered little second growth for sale while preparing large volumes of old-growth timber for sale, far in excess of the old-growth component of the probable timber sale quantity. *See supra*, ¶ 66. These practices in implementing the Tongass Plan illustrate why Defendants cannot rely on a transition to limit logging in roadless areas.

124. Defendants also relied on the Tongass Plan's habitat conservation strategy to mitigate the effects of logging in roadless areas and assumed the habitat conservation strategy would maintain sufficient reserves and connectivity for wildlife, including endemic species, goshawks, deer, fish, and other animals, even without the added benefits of the Roadless Rule. In 2001, however, the Forest Service explicitly found that the Roadless Rule provided additional, significant protections necessary to protect the "unique and sensitive ecological character of the Tongass" regardless of the protections afforded under the Tongass Plan. 66 Fed. Reg. at 3254. In addition, the analysis for the Tongass Plan considered the Roadless Rule an important protection that enhanced the effectiveness of the habitat conservation strategy and counterbalanced changes to some components of the strategy under the 2016 Amendment. *See supra*, ¶ 64. Because Defendants, in their FEIS for the 2020 exemption, relied on the habitat conservation strategy to prevent any potentially significant adverse effects of logging in areas that they previously recognized benefitted from protection by the Roadless Rule in addition to the habitat conservation strategy, they failed to explain their departure from their previous

factual conclusions in 2001 and 2016 and failed to analyze and disclose such potential effects on wildlife and other environmental values.

125. With the Exemption, logging will now be permitted in roadless areas that contain much of the Tongass's limited, contiguous, intact habitat. This will have significant consequences for endemic species with limited dispersal capabilities like the Prince of Wales flying squirrel, for Sitka black-tailed deer in areas where habitat is already insufficient to meet Tongass Plan standards, for Queen Charlotte goshawks that depend on old growth, for other species, and for the Alaska Native communities, and other people that depend on those species.

126. Because Defendants relied on inaccurate assumptions in conducting their analysis of environmental impacts, Defendants failed to provide an informed estimate or analysis of the direct, indirect, and cumulative environmental effects of their decision to exempt the Tongass from the 2001 Roadless Rule. Therefore, Defendants violated NEPA, 42 U.S.C. § 4332.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment providing the following relief:

A. Declare that Defendants have violated ANILCA, the APA in their administration of the National Forest Management Act and the Organic Administration

Act, and NEPA, and further declare that the actions set forth above are arbitrary, capricious, and not in accordance with law and procedure required by law;

B.      Set aside the ROD and FEIS for the Exemption and any actions taken by Defendants in reliance on either document as void;

C.      Enter preliminary and permanent injunctive relief as needed to prevent or rescind and remedy any actions by Defendants in reliance on the ROD or FEIS;

D.      Grant such other relief as the Court considers just and proper, including plaintiffs' costs of this action and such reasonable attorneys' fees as they are entitled to.

Respectfully submitted this 23rd day of December, 2020,

*s/ Katharine S. Glover*

Katharine S. Glover (Alaska Bar No. 0606033)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

*s/ Nathaniel S.W. Lawrence*

Nathaniel S.W. Lawrence (Wash. Bar No. 30847)
(*pro hac vice pending*)
Garett R. Rose (D.C. Bar No. 1023909) (*pro hac vice pending*)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Plaintiffs*